Hunter v. Town of Mocksville. And whenever you're ready, Mr. Elliott, we'll hear from you. May it please the court. Good morning, your honors. My name is Michael Elliott, and I, with my co-counsel Robert Elliott, represent the police officers in this action. We're also joined by Michael McGinnis on behalf of the Amici. As the court is aware from its earlier review, this action presents three excellent law enforcement officers who were fired for reporting corruption, racism, and other misconduct in the management of the Mocksville Police Department. Unlike our previous appeal, the facts in this case have been established. They've been determined by the jury, recognized by the court, and accepted by defendants. We brought four issues on appeal. We will argue the first two issues today and rest on our brief on issues three and four, unless the court has questions. Though the facts were recognized by the district court, what the court rejected are reasonable remedies to make these plaintiffs whole. I will argue the issue concerning the liability of the town under 1983, and my co-counsel Robert Elliott will argue the issue concerning the scope of the insurance coverage. In Pemboire v. City of Cincinnati, the Supreme Court encapsulates its decision concerning 1983 liability with the deceptively simple phrasing from Monel that a plaintiff may recover from acts of the municipality. Just as Stevens wrote of town liability in his concurring decision in Pemboire, this is not a hard case. Your Honors, I tender to you that like Pemboire, this is not a hard case. When a town such as Mocksville strips away personnel policies, abandons formal review and grievance procedures, and delegates all power to the town manager, when they then memorialize that grant of authority through a town ordinance, they may no longer insulate themselves from the town manager's actions. They may no longer stand and argue vicarious liability and respond to that superior order. For when that transfer occurs, the law is clear. The acts of the manager are the acts of the town. And when the manager violates the constitutional right... Tell me, does this issue depend upon the determination of whether Cook, I guess, and or Bailey were final policy makers here? Yes, Your Honor. We're asking you to find as a matter of law that Christine Brawley, the town manager, was the final policy maker in the town of Mocksville. The undisturbed verdict of the jury... So am I taking it from there that you acknowledge that Cook would not be a final policy maker? Your Honor... I guess because you sort of concede Cook had authority, could be overwritten by Brawley. Your Honor, there's an argument that Cook could be a final policy maker, but I think it's irrelevant. The jury found Christine Brawley liable. So if this court finds that she is a final policy maker, then the town is liable for her actions. What makes her a final policy maker? Of course, the district court seems to rely almost exclusively on state law. Yes, Your Honor. The district court relies on 168-164. And 148. And 148. And what 164 states... And I'll say the district court opinion is very short. It's one page long. And I think there's an over-reliance on 164. It's a permissive statute. 164 says that a town council may adopt ordinances and may adopt personnel policies. When read in conjunction with 148, 148 states, and 148.8 specifically, states that a town manager shall perform any other duties that may be required or authorized by the council. And, you know, those two statutes read in conjunction with the Knoxville Town Ordinance, which was enacted in 2000. Doesn't it say that the manager has such authority as the board may adopt, indicating that the board's going to determine ultimately what she does and what she doesn't do and can presumably overrule it, withdraw it, whatever? But it says, as the board may adopt. Well, 148.8 states that the town manager shall perform any duties that's authorized. In 2000. It's because the board has the control of doing that. Well, I would argue to your honor that this court found in Spell v. McDaniel that retaining unexercised authority does not insulate a town from liability. There's no evidence in the record that the town council in Knoxville ever did anything. And the town ordinance is the explicit delegation of power to the town manager. And what that ordinance states, enacted in 2003, is town personnel shall be employed by the town manager and the terms of the positions shall be at the will of the town manager. It seems to me that that should be the focus, is what the local law is here. The case law, it seems to be pretty clear that you look at the state law and the local law. And I think the statute you're pointing to right there, it at least indicates to some extent that that's the focus point that we ought to be looking to see if, in fact, this town manager had a final policymaking authority. That's right, your honor. That's what Kropotnick says if you look to state law and local law and local custom. And our argument is that Christine Brawley is the final policymaker by custom and practice and by explicit delegations. There's two ways to get there. But what's important to note is that town ordinance is the only personnel policy in the town of Knoxville during the time of the termination. As seen from the testimony of both town manager Brawley, Chief Cook, and the town attorney, in the late 1980s, all personnel policies were repealed in the town of Knoxville, and that included grievance procedures, formal review, oversight. And the effect of that repeal was to place all the power in the hands of the town manager. So our argument is even prior to the town ordinance in 2003, the town manager is final policymaker. Once the ordinance is enacted in 2003, that just makes it explicit that she's the town manager. We would argue that under the Kropotnick test, it's clear that she's the final policymaker, and that states it. So as I understood Judge Eagle's decision in this case, though, she made a distinction between the town manager being the final policy decision maker for personnel matters and being the final decision maker for policy matters writ large. Is that a legitimate distinction? Well, we're not arguing that every decision that Christine Brawley makes is as a final policymaker. There's infrastructure issues, budgetary issues, legal issues where she would not be the final policymaker. But when it comes to employment matters, she is, and that's by both custom and practice. Well, so the question I'm asking you then is that when Judge Eagle's made that distinction, that was incorrect. Yes, Your Honor, that would be our contention. And as we stated, under the Kropotnick test, it's clear that she's the final policymaker as well. She acted within her authority. Her decision was not constrained by any policies that were not. Let me be clear what you're saying. You mean the final policymaking authority for what? For employment matters within the town of Mottsville. And does that mean personnel matters? Yes, Your Honor. So I'm trying to understand Judge Diaz's question and Judge Eagle's distinction there, that if she was the final policymaking authority for personnel matters, does it not encompass what we are talking about here? It would. If she is the final policymaker for personnel matters, it would encompass what we're talking about here. I'm not suggesting that I disagree with you or agree with you. I just quoted you the language that Judge Eagle's relied on. She seemed to make a distinction. She seemed to be implying that unless the town manager was the policymaking authority for all matters, not just personnel matters, that simply being the policymaker for personnel matters by itself would not be enough. And you think otherwise. We think otherwise. Let me ask you, does that lead to the conclusion that it was a town policy to fire people for complaining about the chief of police? Because that's what would have to be encompassed then. In other words, the policy for the reason for firing because it was retaliatory, the jury found it retaliatory firing because these officers were complaining about his leadership and his style of leadership and his lifestyle and so forth. And so it was a town policy to fire somebody because he complained about the chief of police. That's the conclusion you'd have to reach if you disagreed with Judge Eagle's. The law doesn't require that. The law requires that in order to hold the town responsible, the town had to have a policy prohibiting or allowing that particular conduct that occurred. If the town manager did this contrary to what the town policy was, then the town is not liable. And in this case, the town policy would have to be under your argument that you can fire the chief of police, I mean officers who complained about the chief of police's conduct. What Pinbar states and what the case laws. Well, just answer my question whether that follows. It seems to me that's. I would disagree, Your Honor. I would say that what Pinbar states is that a single decision, if it's from a final policymaker, within the scope of the final policymaking, a single decision can attach liability to the town. But the whole Monell doctrine is that the town liability has to be based on the fact that it's the town's policy to do what the conduct was. And you get there by mechanism to find out who the final policymaker was. But ultimately, the liability is created because it is the town's policy to do that. Now, if the manager is carrying out the town's policy to fire people retaliatorily, then that's the town's policy and the town's liable for it. I mean, the town may have a policy traditionally of training officers in this way and that way, and that can be criticized constitutionally. But if you have a town policy that the town would never adopt, I would say that retaliatory conduct that leads to punitive damages, we'd have to conclude that the town of Knoxville had that as its policy, if you argue that she determined the final policy of the town. And Judge Eagles said there's a difference in making the final decision, personnel decision, and the ultimate town policy. I'm just taking your argument where I think it goes. And, Your Honor, what I would state is that what Pinbar states and what the following cases state is that a single decision of a final policymaker can attach liability to the town. Sure, because that's now the final policy. But the final policymaker, clearly the town reserved all the right to make policy. It's stated explicitly. And the fact that the person who's given ultimate decisions to fire and fire does something contrary to the town policy doesn't make the town liable. You'd have to note that it was the policy of the town. She was carrying out the policy of the town. And, ultimately, that's what Monell does. We don't hold the citizens and the taxpayers liable for something that is clearly unconstitutional unless the citizens and the taxpayer or the town, the ultimate decisionmaker, said that is our policy. Then the Constitution visits that. But, anyway, that's what I'm going to do. I want to explore that, though, Judge. Go ahead. Because I don't know of a town policy that's saying anything to the nature that Judge Niemeyer is referring to. What a town has done is conferred upon its town manager an at-will authority to do as she pleases. And they've not said one way or the other what their policy is. And so when you have a final policy-making authority, it may be a ludicrous policy. It may not be one that the town would like to have. But when they delegate it to a final policy-making authority, that's where we look to to determine whether the Monell liability arises. It may be, and I don't think you come at it from the back way, no one's going to say the town has such a ludicrous policy itself. But that's something we're going to have to make up out of whole cloth. What exists here is no policy. And a town who has gotten rid of all policies, personnel policy, delegated it to a town manager who, in turn, has at-will authority. And if I'm reading that differently, that's the confusion I'm getting from the audience. That's exactly right, Your Honor. And the doctrine is that no town is going to enact, for the most part, an unconstitutional policy. And that's consistent with Edwards v. City of Goldsboro and Greensboro Professional Firefighters v. City of Greensboro and Spell v. McDaniel, all decisions of this court. Our argument is consistent with those cases. And so this court should find in plaintiff's favor and find at summary judgment stage that Ms. Brawley was final policy-maker and the town is liable under 1983 as a matter of law. Thank you. All right. We'll hear from, I guess, Mr. Elliott, Robert Elliott. If it pleases the Court, I will address the insurance issue. And the issue is whether the district court improperly limited the insurance coverage of the three separate verdicts for the three separate plaintiffs to a single each claim limit of $1 million instead of the maximum annual aggregate of $3 million designed for the claims of multiple persons. And we contend that it did. In preparing our argument, it occurred to us that Section 3 is the important provision in this insurance policy, the limit of insurance. And that's where we contend that the district court got confused. Section 3 recognizes two rules. And it's on Joint Appendix 2708. It recognizes two rules which, by the plain language of the section, fix the limit of coverage. The rule in Paragraph 2 is the annual aggregate, the most the insurance company will pay for all claims, just like in the declarations. The rule in Paragraph 3 is the each claim limit. It refers to each claim for a single loss arising out of the employment wrongful acts and is consistent with the declarations referring to the each claim limit that a single claim has a limit of $1 million. Now, the second sentence adds to that. It expands the first sentence. And by grammar, it doesn't expand it to different persons. It expands it to additional claims. And it extends that sentence or that rule to apply not only to the single claim of a person but to other claims of that person which are based on or arising out of the same or interrelated acts of one or more insureds. So in this case, Ken Hunter had claims for wrongful discharge against the town and 1983 against the town and Ms. Brawley and Mr. Cook. Four claims were brought all for the same employment wrongful act of termination. He only gets one recovery for the four claims because they're all based on the same act. Now, Paragraph 1 is where the district court we contend got confused. In Paragraph 1 states that regardless of number of plaintiffs, whether it's Ken Hunter or whether it's Ken Hunter, Jerry Medlin, and all three plaintiffs, Rick Donathan, each and every one of them is subject to the same each claim limit. That rule applies over and over and over again. The apparent purpose of the each claim limit is to prevent a duplication of recovery for one person. There is no duplication of recovery with separate claims of separate persons. Three different officers, each has been hurt, each have their own hurt, which is not related to the hurt of the other officers. Two have had their careers destroyed. This interpretation of Paragraph 1 is reasonable and emphasizes that no matter how many claims, insureds, and persons, the annual aggregate of Paragraph 2 will provide a maximum of $3 million on all claims of all persons and to each claim. Mr. Elliott, did all of these claims arise out of the same protected speech? Yes, sir. There was a common plan to the terminations of all three plaintiffs. Why is that not critical in this case in making this determination and interpreting that language there? Well, because each of these plaintiffs had separate losses, and the language referred to indicates a single loss. Each of them had a separate loss. And the fact, I think the cases are clear that the fact that there's one common factor in the three terminations. But the definition, I mean, the statement regarding the claims and the policy doesn't talk about loss. It talks about acts and interrelated acts. It talks about both, Your Honor. The first sentence in Paragraph 2 talks about, or Paragraph 3 says, subject to two above, each claim limit is the most we will pay for all loss. Loss is singular because Rick Donovan's loss is not the same as Ken Hunter's loss. So loss is singular. It's talking about a single person. Then it goes on to modify the acts to require that they be interrelated. And the acts in question are the acts of the claimants in this case, right? The acts in question are the acts of the insurers in this case. Insurers, I'm sorry. Right. Yes. And there was one act. Well, they said three different acts. Okay. But the jury found that it was a common plan. So why aren't they interrelated, I guess, is back to Judge Wynn's question. Well, because the second sentence of Paragraph 3 does not refer to the number of persons. The second sentence of Paragraph 3, in order for those, you can have interrelated acts of an insurer that affects one person. And we contend that what that language means is that the interrelated acts that affect one person can be combined. And that's what I was talking about with Ken Hunter. Ken Hunter has four different claims, but it goes to the same employment wrongful act. Well, let me ask you this. Does the policy actually define interrelated? It does not. And is that significant? I think it is significant, especially when you compare it to Section 1 as the district court did. I think as I understand your argument, you say in part that the district court confused the definition of interrelated with related. Can you talk about that? Yes, sir, I can. Interrelated is undefined in the policy, and the courts have said that when there are two different terms used, then they generally have separate meanings. Related is, of course, defined ad nauseum in Section 1, and yet they don't use that term in Section 3. Interrelated is obviously a narrower term. It means mutual and reciprocal according to the dictionary definition. The drafters have used that term. None of these acts are mutual and reciprocal with each other. They do have a common plan, but the loss to each of them was separate and independent of the loss to the others. So we contend that that interrelated language does not mean that they're different persons, that they're additional persons in Paragraph 3. And our argument is supported by the deductible, because I think everybody has agreed the deductible language and the language in Paragraph 3, Roman numeral 3, have to be consistent. And the deductible language doesn't have any of this preface of regardless of, and it does have the same two sentences, the first of which is clearly talking about a single person. A single person has one deductible. It does say in the deductible, it says claims based on or arising out of the same act or interrelated acts of one or more insured shall be considered a single claim. The deductible applies to the single claim. Yes, sir. Well, to put it simply, in order to have that interpretation of the deductible, just as the same with Paragraph 3, you would have to insert of one or more persons after the term claims in the second sentence. Because they don't say persons, then the clear implications are talking about a single person from the first sentence and that the interrelated acts of insured is talking about the interrelated acts of the insured concerning that person. So they would have to rewrite the language of this policy and put of one or more persons after claims in the second sentence. Because that's already covered by claim. The definition of claim means a demand received by the insured for damages. And it seems to me that a single claim is a demand. And they say if you have claims, multiple of those, that arise out of the same act or interrelated acts, then it's a single claim. Well, one person can, as I pointed out with Ken Hunter, one person can have multiple claims. And so all that sentence is saying is that one person doesn't make multiple demands. One person sends in a demand letter and says, I'm demanding damages because I was injured because I was retaliatory fired. That's a claim. Based on these facts, based on these legal claims. And if the conduct is interrelated, and in this case it's interrelated because it arose out of the very same conduct, I'm not complaining to the state about the police chief. All right. I understand here. Okay. Your Honor, this court should hold as a matter of law that the $1 million each claim limit in the policy applies to limits. All right. Thank you. Mr. Flanagan. May it please the Court. I'm Catherine Little here on behalf of the Interlocal Risk Financing Fund of North Carolina. You'll have to speak up or pull the microphone down. Thank you, Your Honor. She can't hear you. I'm particularly challenged. Thank you. May it please the Court. I'm Catherine Little on behalf of the Interlocal Risk Financing Fund. Well, why don't you pull it down even more? Of North Carolina. How's that? Yeah. Okay. Thank you. And we are, IRFNIC is the municipal risk pool carrier for the town of Moxville, which provided employment practices liability coverage. At this point, in this case, Your Honor, it's very, very important that Mr. Elliott had just misread the language of the policy. I'm sure he didn't do it intentionally. But what he said was under the Section 3 limits of insurance under Paragraph 3. He read it to you all as each claim limit is the most we will pay for a single loss arising out of. It does not say a single loss. In fact, it says all loss. The policy very clearly says that the most we will pay for all loss is the single claim limit. And the most important language that's in Section 3 is found in Section 3 Paragraph 1, which specifically says that the limits of insurance fix the rules below, fix the most we will pay regardless of the number of claims made or suits brought, or most importantly, regardless of the number of persons making claims or bringing suits. And as Your Honors have pointed out, in this claim, there is, in this lawsuit, there is one wrongful act. And even Judge Schroeder, in the order appealed from, concluded that there was one wrongful act. It was these claims arising from one act, namely the town's termination of the appellant's employment. So we don't even have to get bogged down into the related or interrelated argument as long as there was one wrongful act. So if Your Honors agree that there was one wrongful act, specifically the town's wrongful termination of these officers, we don't even go to the related process. Why aren't those three separate acts, three terminations? They're not, Your Honor, because, one, all three of the appellants filed the same joint lawsuit, and the policy specifically defines claim as... I think the question was why aren't they separate acts, because each officer was fired. And that requires a separate act for each officer. Yes, Your Honor. That's the question. Each officer was fired, but it was the common act by the town. Why don't you say those acts are interrelated, because they were fired for the same reason? Well, Your Honor, they clearly are interrelated. Well, you're basically saying that it's the same act. And Judge Diaz asked you, well, why isn't it three separate acts? Well, I believe under the policy it's considered to be one act because they are arising out of this, the claim itself is arising out of the same interrelated acts. Even if you considered it to be three separate acts, three separate terminations, Your Honor, they're clearly interrelated. They all happened on the same day. Well, that's what I thought your argument was. Yes. You said we don't need to pay attention to the interrelated. Well, Your Honor, and I appreciate the distinction. In the order appealed from, Judge Schroeder first found that it was the same wrongful act, and then he found that even if you don't find it to be the same wrongful act, they clearly were interrelated. So I understand the distinction, and I appreciate the distinction. So is there a difference between the acts being interrelated or related? Your opponent seems to suggest that Judge Schroeder confused those definitions and that interrelated is a much narrower concept, which means some connection between the acts. And they say these firings didn't depend one on the other. They were separate acts. Well, even if they were separate acts in terms of at the moment that each particular appellant was fired, it really doesn't matter because they're saying they are either related or interrelated. Even if he argues that interrelated is more restrictive than related or vice versa, it doesn't matter. They are at least related or interrelated. In the common usage of those words, that's why all these appellants joined in the same lawsuit. That's why they proved that this was not just each person's wrongful termination. Let me ask you a hypothetical. Let's say that this happened here. These three officers here were fired because of their complaints against the chief, and some of the other officers get wind of the firings and then lodge their own complaints to the governor, complaining about the firings and the fact that the chief's activities, and then they're fired.  Your Honor, I would certainly say that they are interrelated acts if it all came down to the same reason why they were fired. However, the distinction, Your Honor, in this case is that these three appellants were fired for making one joint phone call to the governor's office. That's what led to the terminations. So that would be different, Your Honor, in your hypothetical, if the particular officers in question had done different things. As far as we know, the only people on this one single phone call to the governor's office reporting alleged misconduct, that were only these three appellants. So, Your Honor, in your hypothetical, if there was another officer, if there were another officer that was included in that phone call and then he subsequently sued, then yes, it would be. As far as we know, there are only these three. But the jury verdict specifically had the same language for each of the three officers. And each of them specifically, under their wrongful termination claim, stated the identical jury issue, whether the same communication that I'm talking about, the one phone call to the governor's office, was a substantial factor in the town's decision to terminate these appellants. So that is clearly the jury verdict itself shows that these acts were interrelated. When I first read Judge Schroeder's opinion, it seemed to make imminent sense to me the way he described and defined the policy and the limits of liability. But then I read the appellant's brief and thought, well, that doesn't seem far-fetched to me either. The language in this policy, like most insurance policies, is not exactly the model of clarity, I don't think. Given that, and given that at least it may be reasonable to agree on two differing definitions of a policy, why doesn't your client lose since it drafted the policy? Your Honor, with the two different definitions, if you're talking about interrelated versus related, I think the answer to your question is that Section 3, which describes the limits of insurance in Paragraph 1, specifically says that it is the most we will pay regardless of the number of persons making claims or bringing suits. Claim is defined as the filing of suit papers. In this case, Your Honor, there's only one claim that was the filing of suit papers. So I think that's the answer to your question, is regardless of the interrelated versus related, the policy language is extremely clear in Paragraph 1, where it specifically states regardless of the number of persons making claims or bringing suits. And I think that's the answer to your question. So, Your Honors, we would specifically ask that the Fourth Circuit Court of Appeal affirm Judge Schroeder's order. The million dollars has already been paid to the court and forwarded to the Appellant's counsel. The policy language is very clear. I didn't get a chance yet to mention that the Eastern District of North Carolina has specifically recently decided a case. When I say recent, it was in December of 2017, but after the briefing. And in that case, it was a Chrysler versus Greenwich insurance case, Your Honor. We submitted this with notice of supplemental authority on Monday. The Eastern District of North Carolina recently approved very, very similar language. In that case, the policy language that was approved by the Eastern District of North Carolina specifically said that two or more claims based upon or arising out of the same wrongful act or any interrelated wrongful acts shall be considered a single claim and one retention shall apply. When was that case handed down? It was filed on Monday with supplemental authority. I mean, when was the decision made by the Eastern District? It was decided December 8, 2017, Your Honor, after the briefing. So, we'll get a chance to answer that one too, won't we? So, that language is very similar and important. I got you, but we'll just answer it here, which will cover both cases. So, in the Chrysler case, they specifically found that that language was clear and unambiguous, and it's so similar to our language here that we think that that, you know, up until this point we hadn't had North Carolina law that was specifically very close in on this point that's being argued right now, but now we do. And I believe I'm almost out of time, Your Honor. You are out of time. Oh, I'm sorry. I'm sorry. Thank you very much. We appreciate your time. Now, are you Ms. Little? Yes, I am. Oh, okay. Appropriate, isn't it? I had you scheduled to argue next, but I'll have Mr. Flanagan now. Yes. Yeah. Thank you. May it please the Court, my name is Pat Flanagan. I represent the town of Mocksville in this matter, and I'm here to address the remaining three issues from the plaintiff's appeal, from first, Judge Eagle's decision to dismiss the 1983 claims against the town, and then Judge Schroeder's post-trial decisions with regard to adequate state remedy under the North Carolina constitutional claim, and then third, whether or not his decision to award front pay to plaintiff Medlin was an abuse of discretion. To award front pay rather than reinstatement. You aren't comfortable to just rest upon your brief on the last two, as did the appellate on this? Yes, sir. I am comfortable resting upon a brief. I just wanted to mention that we are addressing that, and before I get to the first issue, which is what the plaintiffs were arguing, let me just say this. We did submit a supplemental authority a few weeks ago. A North Carolina court of appeals case came out regarding adequate state remedy under the North Carolina constitution. The quorum claim, as we call it, and I wanted to make sure the court was aware of that. That was a court of appeals case that came out in February of 2018. But other than that, we'll be happy to rest on the brief. With regard to the first issue as to whether or not, as you know, the district court, Judge Eagle's, dismissed the plaintiff's 1983 claims, finding that Chief Cook, and I think the plaintiff's conceded that Chief Cook is not a final policymaker in this case, but also that Town Manager Brawley was not a final policymaker in this case. I didn't think that's the issue. You know, this is always a complex area, Monell. But in PEMBAR and in our decision in Greensboro, we didn't focus on who was the final decision maker. As a matter of fact, in both of those cases, the final decision, policy decision was, the discretion was, full discretion was given to the town manager. What we said and what the Supreme Court said is that who has authority to make the final policy. And I mean, I'm seeing here in Greensboro, the same contention was made that's made here. Appellants contend that the city is liable in this case because the Fire Chief Jones had not only final decision making authority for personnel decisions, but also final authority to establish municipal policy with regard to union activities on its employees. And we said if the Fire Chief Jones was authorized pursuant to state law to establish the municipality's policy with regard to unions, it would follow the municipality would be responsible for that policy. And that's exactly what PEMBAR said in clarification of Monell. And so it seems to me the question we should be focusing on is whether state law authorized the authority of the town to be transferred. And I think in this case, we're lacking on that, aren't we? Yes, sir. I think that is... But you sort of stated the question on whether the town manager had that authority, was delegated. And it seems to me it doesn't focus on what happened in fact, who had the authority to establish the policy. That's right, Your Honor. And as well in the Crowley case, which we cited in our brief, this court found that same thing. And the distinction and the confusion is between decision making ability and policy making authority. And so in... I'm just focusing on the authority. Yes, sir. You stated when you opened up your issue, you didn't make the distinction. But Judge Eagles did make that distinction, and appropriately so. And appropriately so, as did this court in the Greensboro case. Greensboro and in PEMBAR. And in PEMBAR. And in the Greensboro case, as you know, the town manager in that case had been given the specific policy making authority by the town council on that, but the fire chief had not. When we look towards this issue, we do have to look towards North Carolina law, and specifically the North Carolina statutes. In North Carolina, as you know, this court knows... But let's make sure we're speaking on the same terms here. PEMBAR did address this, did not obviate the use of local laws. There's a series of cases that say state and local laws. Even the city of Greensboro has languished the relevant state and city laws. So I don't think you ignore local law in this process. And under North Carolina law, constitutionally, all this power rests with the state. They then can delegate only that which the municipality can delegate to them, who in turn can delegate. And I don't know how much more delegation you can do than when you make a specific ordinance after getting rid of all of your policies that says it's completely at the will of the town manager. Then who has the final authority on that? I mean, if that's not final authority making, what is it? I would respectfully disagree with a couple of things there. Number one, you're absolutely correct in that the state legislature gives the local government the authority in certain things that they're allowed to do, their powers and their duties. And they specifically set forth in 168-148 what the town manager can do, which includes hiring and firing. They specifically set forth in 168-164 and 168-... But to make sure we're speaking on the same terms, do you contend that the city itself does not have the authority to delegate that which has been delegated? Is that where you're going? I would contend that the city, first of all, that they did not delegate full policymaking authority with regard to personnel matters to the town manager. I'm only speaking to, and maybe this is where the contention is, if he has final policymaking authority as to personnel matters, that's all this is, looks to me, then do they have that authority to do that? Two things, Your Honor. I would say, first of all, the city does not have the authority, pursuant to state statute, to delegate personnel matters, all personnel matters. They can delegate the decision making, but not the policymaking authority to the town manager. Second, that's not what the town of Montsville did here in that their personnel... Well, before you get to the second, what's their authority for the first? I think there is nowhere in any of the state statutes that the state has said the town council or town board may delegate personnel authority to a town manager. What they've said is they may adopt or provide for rules and regulations or ordinances and other matters which determine wages and hours of work. There's no question the city can delegate to the town manager that authority, absolutely can, and they did in this case. And it didn't matter if she made a bad decision or a good decision. They said at will, and that was the end of it. And contrast that with they have some additional language, and they say fringe benefits, though, have to come and be approved by the board. And that distinction makes very clear they gave that authority to this town manager here. Now the question of whether the state prohibits them from doing so, I don't know of a case that says that. But I think that that distinction, Your Honor, with all due respect, shows that they did not give final policymaking authority across the board on personnel matters to the town manager, but simply allowed her to be the decision maker on hiring and firing, the at will, the terms of the employment, and the term of the employment being whether or not it's a year or two years or it's day to day. As you know, North Carolina is an at will state. It can be terminated for any reason or no reason as long as it's not illegal reason, and that is what the town board did here. And as a matter of fact, as you recall. That's the distinction that both PEMBAR and Greensboro made is that the final decisionmaking authority can be delegated, but that doesn't mean that the town gave up its authority, policymaking authority, decisionmaking versus the ultimate policymaking authority. And the town always reserved it and could have withdrawn it, could have changed it at any time, could have overruled it, and the statute, of course, is explicitly what says that. And that's specifically what they did in the late 80s when they decided that the personnel rules that they had in place they did not want in place anymore. They changed it, modified it, and even in this article. This is not limited just to hiring and firing. This is not just an at will decision. The language is the terms of the positions shall be at the will of the town manager. That's not just hiring and firing. That's all of the policies and everything that goes with it. Well, it also talks about how the remaining, the benefits and such, should be subject to the approval of the board. It separated fringe benefits, so you're exactly right. That's not just that one thing, which if they wanted everything else to be subject to be approved by the board, they would have said so. They also didn't. They just carved out that exception to this authority they gave this town manager. Two things, Your Honor. They also referenced various statutory references, as you can see, authority of police, personnel rules, et cetera, in the state statute. Second, as a practical matter, and the record bears out, the town manager on a regular basis consulted with the mayor and the town council with regard to personnel matters. Employees were allowed to and regularly did go to the town council with regard to personnel matters. There are specific examples that were set forth in our brief. So while it doesn't specifically say that in this ordinance, as a practical matter, the custom and the policy of the town was that personnel matters were discussed between the town manager, the town attorney, the town board, and the mayor, as well as employees being allowed to. That's just an opportunity to make sure that you're doing your job right and you're making the folks above you happy. It doesn't mean you don't have the final policy-making authority. He didn't have to. There's nothing that says he has to do that. But if he chooses to do it, he certainly can, and it's prudent to do it. My time is up, Your Honor, but if I may, we would ask that the court of appeals affirm both Judge Eagle's dismissal of the claims against the city, the 1983 claims against the city, as well as Judge Schroeder's decisions. Thank you. Thank you. Mr. Robert Elliott, I guess, is to rebuttal. Your Honor, just a few points. On the 1983 argument, we agree with Judge Wynn that the local law determines this case, and the local law was found in the local ordinance that was the power to employ and to determine the terms at will. So you're suggesting that the town gave up its authority to establish policy? It delegated. Well, why are people appealing to the town on various matters? Why does the town have authority on pension matters? All these are indicative that they didn't give up their authority. What they did is gave final decision-making authority as opposed to ultimate policymaking. Your Honor. This is exactly that. Nobody seems to be addressing, neither side, very well, with Pembar and Greensboro, the distinction they made, and Judge Eagle's got that. Well, this is what Pembar said, and this is in the city of Edwards versus the city of Goldsboro. Yeah. While municipal policy is most easily found in municipal ordinances, it may also be found in formal or informal ad hoc policy choices, a municipal liability may be imposed on a single decision by a municipal policymaker. Authority was delegated by the ordinance. Then now read the particular application, and it says the contention was made that the city is liable in this case because Fire Chief Jones had not only final decision-making authority, which you're arguing in this case, for personnel decisions, but also final authority to establish municipal policy. And we said if Fire Chief Jones was authorized pursuant to state law to establish municipalities policy with regard to unions, it could follow that policy, and, of course, the policy would be responsible. By delegating the decision-making authority, as long as legally they had the authority, and in this case the board legally always had authority to change ordinances, change policies, withdraw it, to hear people reserve, give part of it, that's the ultimate policymaking authority. And the consequence, as you know, is if your argument is a correct one, then the town is being imputed with a policy to retaliatorily fire somebody because that's the only way the town can be liable, if it's its policy to do that. Well, we contend the ordinance is broader than that, and the custom and practice was broader than that that gave Brawley complete authority over personnel matters. And the ordinance says that, and the actions speak loud to that. And remember, in this case, Rick Donathan went to Buster Cleary, who was on the board, to try to seek some kind of review and was sent right back to Brawley and was fired. Your Honor, my time is up. Okay, thank you. Thank you. I think we understand the issues. All right, we'll come down to Greek Council and proceed on to the next case.
judges: Paul V. Niemeyer, James A Wynn Jr., Albert Diaz